# IN THE UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

---

No. 15-1448

---

## Michelle Mammaro
*Plaintiff-Appellee*

v.

## Division of Child Protection and Permanency (DCP&P), et al.
*Defendants-Appellants*

---

On Appeal from the United States District Court
For the District of New Jersey, No. 3-13-cv-06483 (Hon. Freda L. Wolfson, U.S.D.J.).

---

### Brief for Appellants and Joint Appendix Volume I, pp.1-29

JOHN J. HOFFMAN
ACTING ATTORNEY GENERAL OF
NEW JERSEY
R.J. Hughes Justice Complex
25 Market Street, P.O. Box. 112
Trenton, New Jersey 08625-0112
*Attorney for Defendants-Appellants*

By:    Benjamin H. Zieman (NJ ID # 082712013)
       Deputy Attorney General
       609-292-4999
       Benjamin.Zieman@dol.lps.state.nj.us

Michael C. Walters
Assistant Attorney General
       Of Counsel

# **Table of Contents**

**Page**

Table of Authorities ....................................................................................... iii

Statement of Jurisdiction ................................................................................ 1

Issue Presented .............................................................................................. 2

Statement of the Case ..................................................................................... 2

Related Cases and Proceedings...................................................................... 6

Standard of Review ........................................................................................ 7

Summary of Argument ................................................................................... 7

Argument...................................................................................................... 11

    I.    THE COLLATERAL ORDER DOCTRINE PERMITS THIS COURT TO EXERCISE JURISDICTION BECAUSE A DENIAL OF QUALIFIED IMMUNITY IS CONCLUSIVE, DISTINCT FROM THE MERITS, AND UNREVIEWABLE FROM A FINAL JUDGMENT. ............................................ 11

    II.   APPELLEE HAS NOT ARTICULATED A VIOLATION OF CLEARLY ESTABLISHED LAW NECESSARY TO OVERCOME THE QUALIFIED IMMUNITY FROM SUIT THAT THE APPELLANTS POSSESS. ..................... 15

        A.    Neither Supreme Court Nor Third Circuit Precedent Clearly Establishes that the Substantive Component of the Due Process Clause Prohibited Appellants from Temporarily Removing Appellee's Child from Her Custody Under the Circumstances Confronting Appellants. ................................................................ 20

        B.    Appellee Cannot Identify a "Robust Consensus of Cases of Persuasive Authority" Holding that a Caseworker, Confronted with Objective Evidence Similar to that Present Here, Violated the Substantive Component of the Due Process Clause.................................................................................................................. 24

Conclusion.................................................................................................... 35

Certifications ............................................................................................... 36

## Table of Authorities

**Cases**                                                                                    **Page**

Anderson v. Creighton, 483 U.S. 635 (1987) ....................................................... 15, 17, 18

Arredondo v. Locklear, 462 F.3d 1292 (10th Cir. 2006) ................................................. 8

Ashcroft v. al-Kidd, 563 U.S. ___, 131 S. Ct. 2074 (2011) ....................................... passim

Barkes v. First Corr. Med., Inc., 766 F.3d 307 (3d Cir. 2014) ....................................... 16

Brokaw v. Mercer Cnty., 235 F.3d 1000 (7th Cir. 2000) ........................................... 25, 26

Brosseau v. Haugen, 543 U.S. 194 (2004) ........................................................... 17

Burns v. Pa Dep't of Corr., 642 F.3d 163 (3d Cir. 2011) ............................................. 7

Callahan v. Lancaster-Lebanon Intermed. Unit, 880 F. Supp. 319 (E.D. Pa. 1994) .... 26

Cnty. of Sacramento v. Lewis, 523 U.S. 833 (1998) ................................................ 16

Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541 (1949) ...................................... 12

Croft v. Westmoreland Cnty. Children & Youth Servs., 103 F.3d 1123 (3d Cir. 1997).
......................................................................................................... passim

De La Font v. Beckelman, 264 F. Supp. 2d 650 (N.D. Ill. 2003) ................................... 30

Delbridge v. Schaeffer, 569 A.2d 872 (N.J. Super. Ct. Law Div. 1989) ....................... 34

Doe v. Groody, 361 F.3d 232 (3d Cir. 2004) ...................................................... 13

Fleisher v. Standard Ins. Co., 679 F.3d 116 (3d Cir. 2012) ....................................... 14

Foy v. Holston, 94 F.3d 1528 (11th Cir. 1996) .................................................... 26

Franz v. Lytle, 791 F. Supp. 827 (D. Kan. 1992) .................................................. 21

Frazier v. Bailey, 957 F.2d 920 (1st Cir. 1992) .......................................... 11, 25, 26, 27

Gedrich v. Fairfax Cnty. Dep't of Fam. Servs., 282 F. Supp. 2d 439 (E.D. Va. 2003) 30

Gomes v. Wood, 451 F.3d 1122 (10th Cir. 2006) ...............................................24, 30, 31

Gottlieb v. Cnty. of Orange, 84 F.3d 511 (2d Cir. 1996) ................................. 25

Harlow v. Fitzgerald, 457 U.S. 800 (1982) ...................................................... 16

Hatch v. Dep't for Children, 274 F.3d 12 (1st Cir. 2001) ........................................8, 24

Hidahl v. Gilpin Cnty. Dep't of Soc. Servs., 938 F.2d 1150 (10th Cir. 1991)............... 26

Hodge v. Jones, 31 F.3d 157 (4th Cir. 1994)...............................................21, 25

Hodorowski v. Ray, 844 F.2d 1210 (5th Cir. 1988) ...........................................21, 25, 27

Hope v. Pelzer, 536 U.S. 730 (2002) ................................................................ 16

Hunter v. Bryant, 502 U.S. 224 (1991)............................................................. 14

Johnson v. Jones, 515 U.S. 304 (1995)..........................................................11, 13

K.D. v. Cnty. of Crow Wing 434 F.3d 1051 (8th Cir. 2006)....................................27, 28

Kia P. v. McIntyre, 235 F.3d 749 (2d Cir. 2000) ........................................ 27, 28, 29, 33

Malik v. Arapahoe Cnty. Dep't of Soc. Servs., 191 F.3d 1306 (10th Cir. 1999).......... 31

Malley v. Briggs, 475 U.S. 335 (1986) ............................................................. 17

Manzano v. S.D. Dep't of Social Servs., 60 F.3d 505 (8th Cir. 1995).....................25, 26

Meyer v. Nebraska, 262 U.S. 390 (1923) ......................................................... 20

Miller v. City of Phila., 174 F.3d 368 (3d Cir. 1999) .................................................18, 23

Millspaugh v. Cnty. Dep't of Pub. Welfare, 937 F.2d 1172 (7th Cir. 1991).................. 9

Mitchell v. Forsyth, 472 U.S. 511 (1985) ................................................................1, 12, 14

Montanez v. Sec'y Pa. Dep't of Corr., 763 F.3d 257 (3d Cir. 2014) ............................... 7

Montanez v. Thompson, 603 F.3d 243 (3d Cir. 2010) ........................................................ 7

Myers v. Morris, 810 F.2d 1437 (8th Cir. 1987) .....................................................25, 26, 27

O'Donnell v. Brown, 335 F. Supp. 2d 787 (W.D. Mich. 2004).................................... 31

Orlik v. Dutchess Cnty., 603 F. Supp. 2d 632 (S.D.N.Y. 2009) .............................. 27, 29

Pearson v. Callahan, 555 U.S. 223 (2009) .......................................................... 14

Pierce v. Society of Sisters, 268 U.S. 510 (1925).................................................. 20

Plumhoff v. Rickard, ___ U.S. ___, 134 S. Ct. 2012 (2014) ...................................passim

Prince v. Mass., 321 U.S. 158 (1944) .................................................................. 20

Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc., 506 U.S. 139 (1993) 11

Reichle v. Howards, ___ U.S. ___, 132 S. Ct. 2088 (2012)............................................ 20

Santosky v. Kramer, 455 U.S. 745 (1982).............................................................. 20

Slough v. Telb, 644 F. Supp. 2d 978 (N.D. Ohio 2009)................................................ 31

Southerland v. City of New York, 680 F.3d 127 (2d Cir. 2011) .............................. 21, 33

Stanley v. Illinois, 405 U.S. 645 (1972) .............................................................. 20

Stanton v. Sims, ___ U.S. ___, 134 S. Ct. 3 (2013) ........................................................ 17

Troxel v. Granville, 530 U.S. 57 (2000) .............................................................. 20

Van Emrik v. Chemung Cnty. Dep't of Soc. Servs., 911 F.2d 863 (2d Cir. 1990).....8, 9

Weaver v. Marling, 2:12-CV-1777, 2013 WL 4040472 (W.D. Pa. Aug. 8, 2013) ........ 19

Whisman v. Rinehart, 119 F.3d 1303 (8th Cir. 1997) ........................................................ 31

White v. Chambliss, 112 F.3d 731 (4th Cir. 1997) ..................................................8, 9, 15

<u>Wisconsin v. Yoder</u>, 406 <u>U.S.</u> 205 (1972) ........................................................... 20

<u>Yuan v. Rivera</u>, 48 <u>F. Supp.</u> 2d 335 (S.D.N.Y. 1999) ......................................... 31

## **Statutes**

18 <u>U.S.C.</u> § 1331 ........................................................................................................ 1

28 <u>U.S.C.</u> § 1291 ........................................................................................... 1, 11, 12

42 <u>U.S.C.</u> § 1983 ................................................................................................ passim

42 <u>U.S.C.</u> § 1985 ................................................................................................... 1, 5

42 <u>U.S.C.</u> § 1986 ................................................................................................... 1, 5

<u>N.J. Stat. Ann.</u> § 2C:25-18 ............................................................................... 22

<u>N.J. Stat. Ann.</u> 10:6-2 ......................................................................................... 5

<u>N.J. Stat. Ann.</u> 9:6-8.29 ..................................................................................... 33

## **Rules**

<u>Fed. R. App. P.</u> 4(a)(1)(A) .................................................................................. 1

<u>L.A.R.</u> 28.1(a)(2) .................................................................................................. 6

## Statement of Jurisdiction

### I. Subject matter jurisdiction

The District Court below had subject matter jurisdiction over appellee's Complaint pursuant to 18 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treatises of the United States.") because the Complaint seeks redress for various constitutional violations pursuant to 42 U.S.C. §§ 1983, 1985, and 1986. (A46-57).

### II. Appellate jurisdiction

By Order dated January 16, 2015, the District Court denied appellants' motion to dismiss appellee's substantive due process claims, holding that appellants were not entitled to qualified immunity because they violated clearly established law. (A3-4, A28-29). The District Court's Order "is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291" because under the collateral order doctrine, the denial of qualified immunity is conclusive, separate from the merits, and unreviewable from a final judgment. See Mitchell v. Forsyth, 472 U.S. 511, 530 (1985); see also Plumhoff v. Rickard, ___ U.S. ___, ___, 134 S. Ct. 2012, 2018-20 (2014). Appellants filed a timely Notice of Appeal with the District Court on February 17, 2015. See Fed. R. App. P. 4(a)(1)(A). (A1-2). Therefore, this Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291.

## Issue Presented

Whether, by October 28, 2011, case law "clearly established" that child welfare caseworkers lack an "objectively reasonable suspicion of abuse" to temporarily remove a nineteen-month-old child from a parent who, while caring for her child, was recently hospitalized as a result of a domestic violence incident with her husband, provided two positive drug tests, and violated a supervised contact restriction by unilaterally moving with the child from a shelter to an unapproved home? (A25-29).

## Statement of the Case

The Division of Child Protection and Permanency ("DCP&P"), formerly known as the Division of Youth and Family Services ("DYFS"), is New Jersey's child protection and child welfare agency and is situated within the Department of Children and Families ("DCF"). (A31). Appellants[1] are Alireichen Grazani and Benjamin Rehig (supervisors of child protective services workers); and Susan Hacker, Rebecca LaBarre, and Krista DeBroux (child protective services workers).[2] (A31, A33-35).

DYFS first became involved with this family on July 22, 2011, when a caseworker met with appellee, Michelle Mammaro, at a hospital. (A37). During this meeting, the

---

[1] DCF Commissioner Allison Blake and DCP&P Director Kara P. Wood were named in the Complaint along with appellants (collectively "DYFS Defendants") (A31-32), but take no part in this appeal.

[2] The Watchung Police Department and some of its known and unknown employees were also named in the Complaint (A32-33), but these defendants take no part in this appeal. Plaintiff additionally named Omega Laboratory, Inc., and one of its employees, Patrick Minno (A35), but the District Court granted their motion to dismiss on September 30, 2014. (A70).

caseworker learned that appellee was wounded during an incident of domestic violence with her husband, Damon Mammaro, which occurred while she was caring for her nineteen-month-old daughter, D.M. (A36-37). Appellee received treatment for her wounds and was released from the hospital later that day, while her husband was arrested and charged with various offenses, including second degree aggravated assault, second degree possession of a dangerous weapon for an unlawful purpose, and fourth degree possession of a dangerous weapon. (A37). After the caseworker completed her discussion, appellee arranged for D.M., who was allegedly unharmed during the incident, to stay at her brother-in-law's home for the night. (A37-38). Appellee then went home, where she used marijuana "in an attempt to self-medicate the stress and anxiety of the domestic violence which had just occurred." (A39).

In the two weeks following the domestic violence incident, a DYFS caseworker continued to investigate by meeting with appellee at her home, by speaking to appellee's husband and brother-in-law, and by conducting a criminal background check. (A38-40). Although appellee merely reiterated her account of the domestic violence during the home visit, her brother-in-law – the same person with whom she trusted the care of her child immediately after she was involved in a domestic violence incident with her husband – accused her of abusing substances while caring for D.M. (A38, A40, A44). In addition, the criminal background check revealed that appellee was once charged with a disorderly persons offense for marijuana possession. (A39).

3

Shortly after the domestic violence incident, appellee applied for a restraining order against her husband and appeared in court on two separate occasions to obtain it. (A38-39). A DYFS caseworker attended each hearing and was able to observe the husband's sworn testimony at the second hearing concerning appellee's behavior. (A38, A40). After each hearing, the caseworker also informed appellee that "someone had made allegations against her" and requested that she submit to drug tests. (A38-39). Appellee tested positive for marijuana on July 28, 2011 and August 4, 2011, thus confirming the "hearsay allegations" of drug use. (A39-40).

Thereafter, DYFS commenced formal child abuse and neglect proceedings by filing a verified complaint for temporary guardianship of D.M. (A40). As a result of that action, DYFS enrolled appellee into a women's group for battered and drug abusing women and placed her on random drug screening, and while under such close scrutiny, she tested negative on four occasions throughout August and September 2011. (A39, A41). Appellee's compliance with that random drug screening allegedly prevented her from attending a meeting with social services to secure public assistance, causing her to lose benefits. (A41). Additionally, although appellee retained physical custody of D.M. after litigation commenced, DYFS required all of their contact to be monitored by an approved in-home supervisor. (A41). To comply with this order, appellee entered into a safe house facility. (A41).

By October 2011, appellee could not obtain an extension of time to continue staying at that safe house facility, so she unilaterally decided to move with D.M. into a

home that DYFS had not yet approved. (A42). As a result, DYFS contacted the Watchung Police and executed an emergent removal of D.M. from appellee's custody on Friday, October 28, 2011. (A42). D.M. was returned to appellee's custody following a hearing "several days" later, and the home was thereafter approved as an appropriate setting. (A42).

On November 21, 2011, appellee submitted to a hair follicle drug test, which was positive for cocaine and marijuana. (A43). Seven months later, the family court conducted an abuse and neglect trial, during which the credibility of this hair test allegedly did not withstand scrutiny on cross-examination of the witness from the testing company because the reported levels of the illegal substances were too close to the cutoff levels to be considered positive. (A43-44). On June 27, 2012, the court found that appellee did not abuse or neglect D.M. and dismissed the case. (A43-45).

On October 28, 2013, appellee filed a seven-count Complaint, seeking both injunctive and monetary relief for the allegedly unconstitutional manner in which appellants investigated and pursued a child abuse and neglect action against her. (A5-6, A9). The first six counts were brought pursuant to 42 U.S.C. §§ 1983, 1985, and 1986 for alleged violations of Plaintiff's First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendment rights. (A5-6). The seventh count is a pendent state law claim for violations of the New Jersey Civil Rights Act ("NJCRA"), N.J. Stat. Ann. § 10:6-2. (A6).On June 3, 2014, the DYFS Defendants filed a motion to dismiss, asserting sovereign immunity, absolute immunity, and qualified immunity. (A9-10). On January 16, 2015, the District

5

Court granted the DYFS Defendants' motion to dismiss all claims except for the claims in counts one and two for injunctive relief; the § 1983 claims in counts four and five alleging violations of appellee's substantive due process right to be free from "excessive interference with raising a family" and from "excessive interference with family relationships"; and the claim in count seven for violations of the NJCRA. (A4, A9, A52, A54).

This appeal concerns the District Court's denial of the appellants' motion to dismiss appellee's substantive due process claims in counts four and five on the basis of qualified immunity. Relevant to this appeal, the District Court held:

> [appellee's] allegations may support her claim that DYFS employees violated her clearly-established constitutional rights by engaging in conduct that is sufficiently conscience-shocking or unlawful to a reasonable officer at the time. See Weaver v. Marling, No. 2:12-CV-1777, 2013 U.S. Dist. LEXIS 111518, 2013 WL 4040472, at *7 (W.D. Pa. Aug. 8, 2013).
>
> [A29.]

Thereafter, appellants filed a timely Notice of Appeal with the District Court on February 17, 2015. (A1-2).

## <u>Related Cases and Proceedings</u>

This case has not been before this Court previously. Additionally, the undersigned is not aware of any other case or proceeding in any way related, completed, pending, or about to be presented before this Court or any other court or agency, state or federal. See L.A.R. 28.1(a)(2).

## Standard of Review

"[Q]ualified immunity 'raises a purely legal issue' that [the Third Circuit] reviews de novo." Montanez v. Sec'y Pa. Dep't of Corr., 763 F.3d 257, 265 (3d Cir. 2014) (citing Burns v. Pa Dep't of Corr., 642 F.3d 163, 170 (3d Cir. 2011)). This Court also "exercise[s] de novo review over an argument alleging a lack of appellate jurisdiction." Montanez v. Thompson, 603 F.3d 243, 248 (3d Cir. 2010).

## Summary of Argument

The District Court committed reversible error by not canvassing Supreme Court, Third Circuit, and sister Circuit authority reported as of October 28, 2011 to determine whether appellees' removal of appellant's child under these circumstances violated "clearly established" law prohibiting removal in the absence of reasonable suspicion. Instead, the District Court relied on a single, unpublished district court case decided two years after these events to find that every reasonable official in these circumstances would agree that appellants' behavior violated appellee's substantive due process right to family integrity. This analysis was insufficient and incorrect. Properly conducted, this analysis compels a finding that appellants are entitled to qualified immunity.

Child welfare caseworkers, when deciding whether to remove a child from a parent's custody due to concerns of actual or imminent abuse or neglect, are required to engage in a difficult decision-making process that involves weighing the competing rights of parents and their children. Indeed, as the Second Circuit noted:

> Though a decision to remove a child from parental custody implicates the constitutional rights of the parents, it obliges protective service caseworkers to choose between difficult alternatives in the context of suspected child abuse. If they err in interrupting parental custody, they may be accused of infringing the parents' constitutional rights. If they err in not removing the child, they risk injury to the child and may be accused of infringing the child's rights.

> [Van Emrik v. Chemung County Dep't of Soc. Servs., 911 F.2d 863, 866 (2d Cir. 1990).]

The First Circuit has also noted the difficult choices that caseworkers often face:

> We live in an era in which case workers operate under enormous pressure, confronted with the necessity of making on-the-spot judgments on the basis of limited and often conflicting information. Circumstances frequently force them to make difficult choices without time for extensive investigation. When presented with evidence of apparent child abuse, a case worker must have a fair amount of leeway to act in the interest of an imperiled child – and it is better to err on the side of caution than to do nothing and await incontrovertible proof.

> [Hatch v. Dep't for Children, 274 F.3d 12, 22 (1st Cir. 2001).]

Other Circuits have made similar observations. See, e.g., Arredondo v. Locklear, 462 F.3d 1292, 1293 (10th Cir. 2006) ("The state's failure to act on reasonable suspicion of abuse can have unthinkable consequences for the children: physical injury, emotional scarring, a lifetime of recovery, disease, dysfunction, or death. But false positives can carry grave and irreversible consequences as well: anguish for the family, public humiliation, developmental setbacks for the children, distrust, or divorce."); White v. Chambliss, 112 F.3d 731, 737 (4th Cir. 1997) ("Premature action by a social worker can

8

disrupt the legitimate interest parents possess in raising and disciplining their children. On the other hand, a failure to act can leave a child defenseless in the face of physical abuse and brutality."); Millspaugh v. County Dep't of Pub. Welfare, 937 F.2d 1172, 1176-77 (7th Cir. 1991) ("Social workers often act on limited information; those who tarry, or resolve all doubts in favor of the parents, chance enduring damage to the children.").

Given these difficult choices, it is no wonder that numerous Circuits have also recognized that qualified immunity is the appropriate mechanism for "help[ing] social workers put their private interests aside and concentrate on the welfare of children." Millspaugh, 937 F.2d at 1176-77; see also White, 112 F.3d at 737 (noting that removal decisions "are precisely the sort that the doctrine of qualified immunity is designed to protect" because "[i]f section 1983 liability attaches too readily . . . the course of public agencies would invariably become one of inaction, thus leaving children in abusive environments"); Van Emrik, 911 F.2d at 866 ("It is precisely the function of qualified immunity to protect state officials in choosing between such alternatives.").

Qualified immunity protects government officials performing discretionary functions from liability under 42 U.S.C. § 1983 "unless it is shown that the official violated a statutory or constitutional right that was 'clearly established' at the time of the challenged conduct." Plumhoff, ___ U.S. at ___, 134 S. Ct. at 2023 (citation omitted). To determine whether a constitutional right was "clearly established," the question is whether, "at the time of the challenged conduct, the contours of a right [we]re sufficiently clear that every reasonable official would have understood that what he [wa]s doing

9

violate[d] that right." <u>Ashcroft v. al-Kidd</u>, 563 <u>U.S.</u> ___, ___, 131 <u>S. Ct.</u> 2074, 2083 (2011) (citation and quotes omitted). This means that the constitutional question confronted by the official must have been "beyond debate" in light of "controlling authority" or "a robust consensus of cases of persuasive authority." <u>Id.</u> at ___, 131 <u>S. Ct.</u> at 2083-84. The right at issue here is the substantive due process right to family integrity, which is violated when a child welfare caseworker removes a child without "some reasonable and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse." <u>Croft v. Westmoreland County Children & Youth Servs.</u>, 103 <u>F.</u>3d 1123, 1126 (3d Cir. 1997).

In this case, "controlling authority" from both the Supreme Court and the Third Circuit does not clearly establish the alleged unconstitutionality of removing children in these circumstances. Although the Supreme Court has recognized in general terms that parents have a fundamental right to raise their children, the Court has yet to address the constitutionality of removing a child from a parent's custody on an emergent basis due to concerns of actual or imminent abuse or neglect. And although there are two precedential Third Circuit opinions on this issue, each case actually supports the appellants' actions.

Additionally, to the extent that other Circuits have adopted a "reasonable suspicion" standard identical to <u>Croft</u>, cases from these Circuits do not amount to a "robust consensus of cases of persuasive authority." Indeed, since the right of "familial integrity" is balanced against the state's interest in protecting children, it can "rarely be considered 'clearly established,' at least in the absence of closely corresponding factual

10

and legal precedent." <u>Frazier v. Bailey</u>, 957 <u>F.</u>2d 920, 931 (1st Cir. 1992) (citation omitted). Consistent with that formulation, a comparison between the facts of this case and the three most relevant cases as of October 28, 2011 addressing removal in the wake of parental substance abuse concerns shows that appellants had as much, if not more evidence to support this removal than the defendants in those cases that were entitled to qualified immunity. Finally, appellants in this case possessed far more objective evidence to support their reasonable suspicion of abuse than the defendants in the few cases that found a constitutional violation or that denied qualified immunity to caseworkers.

## Argument

### I. THE COLLATERAL ORDER DOCTRINE PERMITS THIS COURT TO EXERCISE JURISDICTION BECAUSE A DENIAL OF QUALIFIED IMMUNITY IS CONCLUSIVE, DISTINCT FROM THE MERITS, AND UNREVIEWABLE FROM A FINAL JUDGMENT.

The Courts of Appeals have jurisdiction over appeals from all "final decisions" entered by district courts. 28 <u>U.S.C.</u> § 1291. Some pretrial orders, such as denials of motions for summary judgment, are not considered "final decisions" when the challenge is based on "evidence sufficiency." <u>See</u> <u>Johnson v. Jones</u>, 515 <u>U.S.</u> 304, 313 (1995). However, the collateral order doctrine exists as an exception for certain pretrial orders that "'[1] conclusively determine the disputed question, [2] resolve an important issue completely separate from the merits of the action, and [3] [would] be effectively unreviewable on appeal from a final judgment.'" <u>Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.</u>, 506 <u>U.S.</u> 139, 144 (1993) (synopsizing collateral order doctrine

criteria initially established in <u>Cohen v. Beneficial Indus. Loan Corp.</u>, 337 <u>U.S.</u> 541, 546 (1949)).

In <u>Mitchell v. Forsyth</u>, 472 <u>U.S.</u> 511, 530 (1985), the Supreme Court found that because a qualified immunity determination meets all three of these criteria, a district court's denial of that immunity "is an appealable 'final decision' within the meaning of 28 <u>U.S.C.</u> § 1291 notwithstanding the absence of a final judgment." First, the Court found that such determinations would be effectively unreviewable on appeal because qualified immunity "is an immunity from suit rather than a mere defense to liability" and would therefore be "lost if a case [were] erroneously permitted to go to trial." <u>Id.</u> at 526. Second, the Court found that such determinations are conclusive, even on a motion to dismiss, because a denial of qualified immunity at that stage conclusively indicates, "there will be nothing in the subsequent course of the proceedings in the district court that can alter the court's conclusion that the defendant is not immune." <u>Id.</u> at 527. Third, qualified immunity is distinct from the merits because a reviewing court need only determine a "question of law: whether the legal norms allegedly violated by the defendant were clearly established at the time of the challenged action." <u>Id.</u> at 528. This is true "even though a reviewing court must consider the plaintiff's factual allegations in resolving the immunity issue." <u>Id.</u> at 529.

In <u>Plumhoff</u>, ___ <u>U.S.</u> at ___, 134 <u>S. Ct.</u> at 2018-20, the Court recently applied the <u>Mitchell</u> rationale to hold that the Sixth Circuit properly exercised jurisdiction over a denial of qualified immunity in a suit alleging excessive force during the pursuit of a

12

fleeing suspect. The Court began by noting that because qualified immunity is "an immunity from suit rather than a mere defense to liability," a decision denying such immunity "could not be effectively reviewed on appeal from a final judgment because by that time[,] the immunity from standing trial will have been irretrievably lost." Id. at ___, 134 S. Ct. at 2019. The Court then noted that unlike the officers in Johnson, the Plumhoff officers were "contend[ing] that their conduct did not violate the Fourth Amendment and, in any event, did not violate clearly established law." Id. at ___, 134 S. Ct. at 2019. Thus, the officers "raise[d] legal issues" whose resolution is a "core responsibility of appellate courts," and that were "different from any purely factual issues that the trial court might confront if the case were tried." Id. See also Doe v. Groody, 361 F.3d 232, 237 (3d Cir. 2004) (finding jurisdiction to review denial of qualified immunity as to police officers because the issue was whether "it was clearly established that police could not broaden the scope of a [search] warrant relying upon an unincorporated affidavit").

Here, like Plumhoff, the District Court's order denying qualified immunity falls within the collateral order doctrine and thus can be appealed now. Appellants are not seeking to appeal any "evidence sufficiency" issues but rather challenge the District Court's erroneous legal determination that they violated "clearly established law." Id. at ___, 134 S. Ct. at 2019. This is an issue identical to the one in Plumhoff, and since jurisdiction was proper there, this Court's exercise of jurisdiction would be proper here. Additionally, the fact that this is an appeal of a motion to dismiss is of no moment

because the Supreme Court has "repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in litigation." Pearson v. Callahan, 555 U.S. 223, 232 (2009) (citing Hunter v. Bryant, 502 U.S. 224, 227 (1991)).

Moreover, when this Court ordered the parties to address jurisdiction through written submissions at the outset of this appeal, appellee objected to jurisdiction by claiming that the appeal is based on issues of fact, and that it is "generally unwise to venture into a qualified immunity analysis at the pleading stage as it is necessary to develop the factual record in the vast majority of cases." Pl. Br. at 6. Appellee's argument lacks merit.

This appeal is not based on "issues of fact which must be determined by way of discovery," Pl. Br. at 2, because in a motion to dismiss, courts "accept all factual allegations as true" and "construe the complaint in the light most favorable to the plaintiff." Fleisher v. Standard Ins. Co., 679 F.3d 116, 120 (3d Cir. 2012). Thus, to the extent that appellee relies on summary judgment cases denying appellate review of genuine issues of material fact concerning the applicability of qualified immunity, see Pl. Br. at 6, those cases are inapposite. Appellee's argument also runs directly contrary to Mitchell, 472 U.S. at 529, which specifically permitted appellate review of a district court's denial of qualified immunity at the motion to dismiss stage because "a question of immunity is separate from the merits of the underlying action . . . even though a reviewing court must consider the plaintiff's factual allegations in resolving the immunity issue."

14

## II. APPELLEE HAS NOT ARTICULATED A VIOLATION OF CLEARLY ESTABLISHED LAW NECESSARY TO OVERCOME THE QUALIFIED IMMUNITY FROM SUIT THAT THE APPELLANTS POSSESS.

Qualified immunity exists "to shield[ ] [government officials performing discretionary functions] from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." Anderson v. Creighton, 483 U.S. 635, 638 (1987). Qualified immunity thus ensures that officials have "breathing room to make reasonable but mistaken judgments about open legal questions," and protects "all but the plainly incompetent or those who knowingly violate the law." al-Kidd, 563 U.S. at ___, 131 S. Ct. at 2085. A determination whether to remove a child, necessarily implicating the difficult balance between ensuring a child's safety and respecting a parent's constitutional rights, is "precisely the sort that the doctrine of qualified immunity is designed to protect" because "[i]f section 1983 liability attaches too readily . . . the course of public agencies would invariably become one of inaction, thus leaving children in abusive environments." White v. Chambliss, 112 F.3d 731, 737 (4th Cir. 1997).

"An official sued under § 1983 is entitled to qualified immunity unless it is shown that the official violated a statutory or constitutional right that was 'clearly established' at the time of the challenged conduct." Plumhoff, ___ U.S. at ___, 134 S. Ct. at 2023 (citing al-Kidd, 563 U.S. at ___, 131 S. Ct. at 2077). Importantly, a constitutional violation is actionable under § 1983 only if it is so "arbitrary in the constitutional sense" that it

"shocks the conscience." County of Sacramento v. Lewis, 523 U.S. 833, 846 (1998). Thus, government officials performing discretionary functions are entitled to qualified immunity unless the extant law "clearly established" that their conduct shocks the conscience. See Plumhoff, ___ U.S. at ___, 134 S. Ct. at 2023.

To determine whether a right was "clearly established," the question is whether, "at the time of the challenged conduct, the contours of a right [we]re sufficiently clear that every reasonable official would have understood that what he [wa]s doing violate[d] that right." al-Kidd, 563 U.S. at ___, 131 S. Ct. at 2083 (citation and quotes omitted). In other words, the unlawfulness of the challenged conduct must be "apparent" such that government officials have "fair warning that their conduct violate[s] the Constitution." Hope v. Pelzer, 536 U.S. 730, 739 (2002); see also Barkes v. First Corr. Med., Inc., 766 F.3d 307, 326 (3d Cir. 2014) (holding that the asserted right must be "sufficiently bounded that it gives 'practical guidance' to officials on the ground"). The inquiry is one of "objective legal reasonableness," where "bare allegations of malice [do] not suffice to subject government officials either to the costs of trial or to the burdens of broad-reaching discovery." Harlow v. Fitzgerald, 457 U.S. 800, 817-19 (1982)).

To determine the "contours" of the right at issue, the Court has held that absent "controlling authority," a "robust consensus of cases of persuasive authority" must have placed the statutory or constitutional question confronted by the officials "beyond debate." al-Kidd, 563 U.S. at ___, 131 S. Ct. at 2083-84. Thus, "if officers of reasonable competence could disagree" about the lawfulness of the challenged conduct within the

confines of the extant legal precedent, then "[qualified] immunity should be recognized." Malley v. Briggs, 475 U.S. 335, 341 (1986).

Importantly, the Supreme Court has repeatedly cautioned lower courts "not to define clearly established law at a high level of generality . . . since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." Plumhoff, ___ U.S. at ___, 134 S. Ct. at 2023 (citation and internal quotes omitted). "The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established." al-Kidd, 563 U.S. at ___, 131 S. Ct. at 2084.  Instead, the Court has required "the right the official is alleged to have violated" to be "'clearly established' in a more particularized, and hence more relevant, sense." Anderson, 483 U.S. at 640. Consistent with that formulation, the Court has recently required a close correspondence between the facts of a suit and the facts of prior cases. See, e.g., Stanton v. Sims, ___ U.S. ___, ___, 134 S. Ct. 3, 5 (2013) (comparing cases addressing "whether an officer with probable cause to arrest a suspect for a misdemeanor may enter a home without a warrant while in hot pursuit of that suspect"); Brosseau v. Haugen, 543 U.S. 194, 200 (2004) (finding that cases failed to clearly establish unconstitutionality of "shoot[ing] a disturbed felon, set on avoiding capture through vehicular flight, when persons in the immediate area are at risk from that flight").

Turning to the law at issue here, this Court has held that when parents claim that a caseworker's emergent pre-hearing removal of their child from their home violated their

substantive due process right to "familial integrity," the question is "whether the information available to the [caseworkers] at the time would have created an objectively reasonable suspicion of abuse justifying the degree of interference." Croft v. Westmoreland County Children & Youth Servs., 103 F.3d 1123, 1125-26 (3d Cir. 1997) (citation omitted). This test recognizes that although parents have a "constitutionally protected liberty interest[] . . . in the custody, care and management of their children," this interest is "not absolute" but must instead be "balance[d]" against "the compelling interests of the state in protecting children from abuse." Id. If a caseworker has an "objectively reasonable suspicion of abuse," id., then the intrusion does not "shock the conscience." Miller v. City of Phila., 174 F.3d 368, 376 (3d Cir. 1999).

The general proposition that emergent removal violates due process unless a state actor "has some reasonable and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse," Croft, 103 F.3d at 1126, however, is as unhelpful to a caseworker as a statement to a police officer that "an unreasonable search or seizure violates the Fourth Amendment," al-Kidd, 563 U.S. at ___, 131 S. Ct. at 2084. In fact, "if the test of 'clearly established law' were to be applied at this level of generality," it would permit appellant "to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of [this] extremely abstract right[]."Anderson, 483 U.S. at 640. Instead, there must be either "controlling authority," or "a robust consensus of cases of persuasive authority," which placed the specific constitutional question confronted by these appellants "beyond

18

debate" such that "any reasonable official in [appellants'] shoes would have understood that [they] w[ere] violating it." Plumhoff, ___ U.S. at ___, 134 S. Ct. at 2023 (citing al-Kidd, 563 U.S. at ___, 131 S. Ct. at 2083, 179 L. Ed. 2d at 1159).

Here, the District Court failed to analyze whether the determination to remove based on the objective evidence known to appellants – multiple, recent positive tests for substance abuse; a recent hospitalization as a result of domestic violence caused by appellee's husband while appellee was caring for her child; and a violation of a supervised contact restriction by unilaterally moving with her child to an unapproved home – was prohibited by "controlling authority" or by "a robust consensus of cases of persuasive authority" in existence at the time of appellants' conduct. Instead, the District Court relied on Weaver v. Marling, 2:12-CV-1777, 2013 WL 4040472 (W.D. Pa. Aug. 8, 2013), an unpublished district court case decided two years after the events in question, as a basis for judging appellants' entitlement to qualified immunity. See slip op. at 25. This was incorrect. See Brosseau, 543 U.S. at 200, n.4 ("[C]ases . . . that postdate the conduct in question" are "of no use in the clearly established inquiry" because they "could not have given fair notice to [the defendant].").

As demonstrated below, the District Court's error compels a finding that appellants are entitled to qualified immunity. Indeed, given the absence of "controlling authority" and the absence of "a robust consensus of cases of persuasive authority" prohibiting appellants' conduct as of October, 28, 2011, it cannot be said that the constitutional question confronting appellants was "beyond debate." al-Kidd, 563 U.S. at

19

___, 131 S. Ct. at 2083-84. In fact, given the recognized uncertainty in this area of law,

appellants surely could not have "reasonably anticipated" that their conduct would "give

rise to liability for damages." Reichle v. Howards, ___ U.S. ___, ___, 132 S. Ct. 2088,

2093 (2012).

## A. Neither Supreme Court Nor Third Circuit Precedent Clearly Establishes that the Substantive Component of the Due Process Clause Prohibited Appellants from Temporarily Removing Appellee's Child from Her Custody Under the Circumstances Confronting Appellants.

The Supreme Court has yet to address the constitutionality of removing a child

from a parent's custody on an emergent basis due to concerns of actual or imminent

abuse or neglect. Instead, the Court has surveyed its "extensive precedent" to recognize

in general terms that "the Due Process Clause of the Fourteenth Amendment protects

the fundamental right of parents to make decisions concerning the care, custody, and

control of their children." Troxel v. Granville, 530 U.S. 57, 65-66 (2000) (citing Santosky

v. Kramer, 455 U.S. 745 (1982); Wisconsin v. Yoder, 406 U.S. 205 (1972); Stanley v.

Illinois, 405 U.S. 645 (1972); Prince v. Mass., 321 U.S. 158 (1944); Pierce v. Soc'y of

Sisters, 268 U.S. 510 (1925); Meyer v. Nebraska, 262 U.S. 390 (1923)).

The Court's broad pronouncement, however, is cast at such a "high level of

generality" that it "avoids the crucial question whether the official acted reasonably in the

particular circumstances that he or she faced," Plumhoff, ___ U.S. at ___, 134 S. Ct. at

2023 (citation and internal quotes omitted), and "is of little help in determining whether

the violative nature of particular conduct is clearly established," al-Kidd, 563 U.S. at ___,

131 S. Ct. at 2084. Other courts agree.  See, e.g., Southerland v. City of New York, 680 F.3d 127, 152-54 (2d Cir. 2011) (acknowledging liberty interest in care, custody, and management of children, yet comparing length of removal to cases involving removal of similar length); Hatch, 274 F.3d at 20 ("We must go further [than Troxel], however, because a right cannot be stated at so high a level of generality for the purposes of a qualified immunity inquiry"); Hodge v. Jones, 31 F.3d 157, 167 (4th Cir. 1994) (refusing to "impose burdens and expectations well beyond their reasonable capacities" by expecting caseworkers "to resolve . . . the precise strictures of the penumbral right of familial privacy, cast in the sweeping language of the Supreme Court cases . . . especially in the face of a legitimate state interest [in the] prevention of child abuse"); Hodorowski v. Ray, 844 F.2d 1210, 1217 (5th Cir. 1988) ("[I]t would be a mistake to conclude that, from Santosky and Stanley alone, the appellants should have known that taking the Hodorowski children into temporary custody violated a constitutional right."); Franz v. Lytle, 791 F. Supp. 827, 833 (D. Kan. 1992) ("The general recognition of the right of a family to stay together or to enjoy familial association and privacy is not sufficient, in itself, to amount to a 'clearly established law' under Harlow.").

Third Circuit precedent as of October 28, 2011 likewise did not provide "fair notice" that under the circumstances confronted by appellants (including a parent's multiple, recent positive tests for illicit substances), a decision to temporarily remove a child from a parent's custody to ensure the child's safety would violate the substantive component of the Due Process Clause.  For example, in Croft v. Westmoreland County

21

Children & Youth Servs., 103 F.3d 1123, 1124-26 (3d Cir. 1997), the Third Circuit concluded that a caseworker who threatened to remove a child unless the father separated himself from his family violated the substantive component of the Due Process Clause because the caseworker lacked "some reasonable and articulable evidence giving rise to a reasonable suspicion that a child ha[d] been abused or [was] in imminent danger of abuse." Id. at 1126. Indeed, not only did the caseworker only receive "a six-fold hearsay report by an anonymous informant" alleging sexual abuse, but her subsequent interview with the parents "confirmed that an incident bearing only the barest resemblance to the anonymous tip had happened," "raised serious concerns about the veracity of the informant," and left her without an "opinion one way or the other whether sexual abuse had occurred." Id. at 1126-27.

The facts in Croft are easily distinguishable from those present here, thus precluding a finding that Croft "clearly established" the alleged unlawfulness of appellants' conduct. In stark contrast to the lack of corroborating evidence in Croft, the appellants in this case corroborated allegations that appellee was using illegal drugs with multiple positive tests for illicit drug use. In addition to this objective evidence, appellee was recently involved in domestic violence with her husband while caring for her child, which raises legitimate concerns for the child's well-being. See N.J. Stat. Ann. § 2C:25-18 (noting that "children, even when they are not themselves physically assaulted, suffer deep and lasting emotional effects from exposure to domestic violence"). Appellants then became aware that appellee unilaterally moved with her child into an unapproved home,

despite the fact that all of appellant's contact with her child needed to be monitored by an approved in-home supervisor. Collectively, these facts unquestionably formed "reasonable suspicion that a child has been abused or is in imminent danger of abuse." Croft, 103 F.3d at 1126. Nothing in Croft suggests otherwise.

In fact, the information available to appellants created as much, if not more, objectively reasonable suspicion of abuse than the information available to the caseworker in Miller v. City of Phila., 174 F.3d 368 (3d Cir. 1999). In Miller, a caseworker received a report from a daycare indicating that based on prior injuries that the daycare sometimes videotaped, two children were suspected victims of physical abuse. Id. at 371. After the children confirmed to the caseworker that they suffered abuse at the hands of their mother and her boyfriend, the caseworker brought the children to a hospital for an exam, which revealed bruising and a "suspicious" mark on one child's back that the doctor believed had been made within the last day. Id. Although the doctor was uncertain whether the injuries were from abuse or an accident, the caseworker sought and obtained an emergency order to remove the children from their mother's custody. Id. The Third Circuit affirmed the dismissal of the mother's complaint, finding that the caseworker "did not act in a way that shocks the conscience" because there was "substantial evidence indicat[ing] that [the caseworker] reasonably believed that the children were in danger of abuse," such as "the day care center's videotapes of bruises," the examining doctor's opinion, and the lengthy history of abuse by the mother's boyfriend. Id. at 377.

23

Miller supports the constitutional propriety of this removal. Indeed, just as the videotapes corroborated the children's statements in Miller, appellees in this case had positive drug tests to corroborate the allegations from the appellant's brother-in-law. And although the doctor's opinion was uncertain and the lengthy history of abuse was circumstantial, here the evidence in this case is undisputed that appellant was caring for her child when she unilaterally moved with her into an unapproved home.

Accordingly, after reviewing controlling authority from the Supreme Court and the Third Circuit, it cannot be said that a "reasonable official in [appellants'] shoes would have understood that [they were] violating" a substantive due process right by removing appellee's child under these circumstances. Plumhoff, ___ U.S. at ___, 134 S. Ct. at 2023, (citing al-Kidd, 563 U.S. at ___, 131 S. Ct. at 2083).

**B.    Appellee Cannot Identify a "Robust Consensus of Cases of Persuasive Authority" Holding that a Caseworker, Confronted with Objective Evidence Similar to that Present Here, Violated the Substantive Component of the Due Process Clause.**

Not a single Court of Appeal that has adopted a standard identical to this Circuit to determine the constitutionality of removing a child from a parent's custody on an emergent basis due to concerns of actual or imminent abuse or neglect[3] has found a

---

[3] The First, Second, Seventh, Eighth and Tenth Circuits have adopted a standard identical to that adopted by this Circuit.  See Gomes v. Wood, 451 F.3d 1122, 1130 (10th Cir. 2006) ("Following the majority approach, we conclude that state officials may remove a child from the home without prior notice and a hearing when they have a reasonable suspicion of an immediate threat to the safety of the child if he or she is allowed to remain there."); Hatch, 274 F.3d at 21-22 (adopting "majority rule" that "an objectively reasonable suspicion of abuse justifies protective measures," including removal and

constitutional violation where, as here, there are multiple positive tests for substance abuse. Given that "the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense," <u>Anderson</u>, 483 <u>U.S.</u> at 640, the lack of analogous case law is compelling.

To begin, courts have characterized the right to family integrity as "amorphous," <u>Frazier v. Bailey</u>, 957 <u>F.</u>2d 920, 931 (1st Cir. 1992), "abstract," <u>Manzano</u>, 60 <u>F.</u>3d at 510, "nebulous," <u>Hodorowski</u>, 844 <u>F.</u>2d at 1217, and "penumbral," <u>Hodge</u>, 31 <u>F.</u>3d at 167. As a result, and perhaps not surprisingly, many courts have described the inherent difficulty of finding anything to be "clearly established" after balancing this vague right against a state's <u>parens patriae</u> interest in protecting children. The First Circuit, for example, opined that because the right of "familial integrity" is "subject to a balancing test," it can "rarely be considered 'clearly established,' at least in the absence of closely corresponding factual and legal precedent." <u>Frazier</u>, 957 <u>F.</u>2d at 931 (citing <u>Myers v. Morris</u>, 810 <u>F.</u>2d 1437, 1462 (8th Cir. 1987)). Many other Circuits agree. <u>See</u>, <u>e.g.</u>, <u>Brokaw v. Mercer</u>

---

placement in "temporary custody"); <u>Brokaw v. Mercer County</u>, 235 <u>F.</u>3d 1000, 1019 (7th Cir. 2000) (holding that "a state has no interest in protecting children from their parents unless it has some definite and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse"); <u>Gottlieb v. County of Orange</u>, 84 <u>F.</u>3d 511, 518 (2d Cir. 1996) ("Where, however, there is an objectively reasonable basis for believing that parental custody constitutes a threat to the child's health or safety, government officials may remove a child from his or her parents' custody at least pending investigation."); <u>Manzano v. S.D. Dep't of Social Servs.</u>, 60 <u>F.</u>3d 505, 511 (8th Cir. 1995) ("[W]hen a state official pursuing a child abuse investigation takes an action which would otherwise unconstitutionally disrupt familial integrity, he or she is entitled to qualified immunity, if such action is properly founded upon a reasonable suspicion of child abuse.").

County, 235 F.3d 1000, 1023 (7th Cir. 2000) ("[B]ecause the balance between a child's liberty interest in familial relations and a state's interest in protecting the child is nebulous at best, . . . the alleged constitutional violation will rarely – if ever – be clearly established."); Manzano, 60 F.3d at 510 ("The need to continually subject the assertion of this abstract substantive due process right to a balancing test . . . makes the qualified immunity defense difficult to overcome" and makes "the requirement that the right be clearly established at the time of the alleged violation . . . particularly formidable."); Foy v. Holston, 94 F.3d 1528, 1537 (11th Cir. 1996) (noting that because "violations of the right to family association are determined by a balancing of competing interests . . . state officials who act to investigate or to protect children where there are allegations of abuse almost never act within the contours of 'clearly established law'"). In fact, at least one District Court in this Circuit conducting this balancing task has found itself "in a quandary as to what plaintiffs' clearly established rights may be in a particular situation." Callahan v. Lancaster-Lebanon Intermed. Unit, 880 F. Supp. 319, 329 (E.D. Pa. 1994).

In light of this inherent difficulty, the First Circuit has held that the right to familial integrity "can rarely be considered 'clearly established,' at least in the absence of closely corresponding factual and legal precedent." Frazier, 957 F.2d at 931 (citing Myers, 810 F.2d at 1462). Other courts have reached similar conclusions. See, e.g., Hidahl v. Gilpin County Dep't of Soc. Servs., 938 F.2d 1150, 1155 (10th Cir. 1991) (affirming district court's finding of qualified immunity because the parents did not cite a case "where a defendant had been held liable under § 1983 on facts which had 'some factual

26

correspondence' to the alleged actions of these defendants"); Hodorowski, 844 F.2d at 1217 ("[I]n the absence of any more fact-specific authority, we do not think that appellants in this case should have known that their conduct in removing the Hodorowski children from the home violated the nebulous right of family integrity.").

The absence of "closely corresponding factual and legal precedent" likewise compels a finding of qualified immunity here. Frazier, 957 F.2d at 931 (citing Myers, 810 F.2d at 1462). Indeed, as of October 28, 2011, the three most relevant cases involving removal of children on the basis of parental substance abuse concerns were K.D. v. County of Crow Wing 434 F.3d 1051 (8th Cir. 2006), Kia P. v. McIntyre, 235 F.3d 749 (2d Cir. 2000), and Orlik v. Dutchess County, 603 F. Supp. 2d 632 (S.D.N.Y. 2009). Not only did each of these cases find that the caseworkers were entitled to qualified immunity, but a comparison between these cases and the facts of this case also makes clear that appellants had as much, if not more, objective evidence from which they could reasonably suspect that appellee's child was in imminent danger of harm absent appropriate supervision. Additionally, appellants in this case possessed far more objective evidence to support their reasonable suspicion of abuse than the defendants in the few cases discussed below that found a constitutional violation or that denied qualified immunity. Together, these two facts convincingly demonstrate the absence of "a robust consensus of cases of persuasive authority." al-Kidd, 563 U.S. at ___, 131 S. Ct. at 2083-84.

In <u>K.D.</u>, officers suspected that the mother was involved in narcotics trafficking because she frequently rented cars that all caused a narcotics canine to make positive alerts when returned. 434 <u>F.</u>3d at 1053.  At two traffic stops, police found various drug paraphernalia in the mother's car and noticed that their narcotics canine again made positive alerts. <u>Id.</u> The mother's car was impounded after the second stop, and when she arrived at the police station with her son to retrieve it the next day, she appeared to be under the influence of a stimulant and submitted a urine screen that later tested positive for marijuana and methamphetamine. <u>Id.</u> at 1054. Although the police did not know of these positive results, they nevertheless placed the child on a "72-hour protective hold." <u>Id.</u> In light of these facts, the Eighth Circuit held that it was reasonable for the officers to conclude that the child's welfare was imminently threatened. <u>Id.</u> at 1056. Accordingly, the officers were entitled to qualified immunity. <u>Id.</u> at 1058.

Likewise, in <u>Kia P.</u>, a hospital notified both child protective services and the mother of a newborn baby girl that the mother was not immediately permitted to bring her daughter home from the hospital upon discharge because a test conducted shortly after birth indicated the presence of methadone in the baby's urine. 235 <u>F.</u>3d at 752. Approximately one week later, the urine sample was subjected to a more sophisticated testing method, which determined that there was actually no methadone present. <u>Id.</u> at 753. The hospital immediately informed child protective services of the negative test result, and although the primary evidence of abuse had been discredited, the hospital nevertheless continued to hold the baby for another two days until it learned from child

protective services that it was safe to release the baby. Id. at 753. In finding no constitutional violation, the Second Circuit held that the Constitution allows child protective services "a short time – a day or two in this case – to process information provided by the test results, to review [the baby's] case in light of [ ] new information, to decide whether to authorize [the baby's] release, and to communicate its decision to the [h]ospital." Id. at 759.

And in Orlik, child protective services filed a successful petition for temporary custody of a newborn after learning that hospital staff was concerned that the mother's "drug seeking behavior" might affect her ability to care for the newborn, and that the mother continued to have a relationship with the putative father, who physically assaulted her during the pregnancy. 603 F. Supp. 2d at 640, 647. The caseworkers also learned of "information regarding [the mother's] emergency room visits to two hospitals," which "indicated that [she] demonstrated prescription-drug seeking behavior while pregnant and that she sought particular medication in spite of medical advice that such medications might endanger the fetus." Id. at 647. Despite the fact that neither the mother nor the child tested positive for drugs, the court found that the caseworkers were entitled to qualified immunity for effectuating a removal based on this information. Id.

In light of the holdings in K.D., Kia P. and Orlik, appellants cannot be said to be on "fair notice" that a removal determination based on multiple, positive tests for substance abuse, prior domestic violence between the parents and a unilateral decision by the mother to move her child to an unapproved home, violated the substantive

component of the Due Process Clause. In fact, compared to the largely speculative levels of proof to substantiate imminent risk of abuse or neglect in those three cases, appellants in this case possessed far more concrete evidence to substantiate their conclusions.

Further, appellants in this case possessed far more objective evidence to support their reasonable suspicion of abuse than the defendants in the few cases finding a constitutional violation or denying qualified immunity. For example, in Gedrich v. Fairfax County Dep't of Fam. Servs., 282 F. Supp. 2d 439, 452-57 (E.D. Va. 2003), the court found that a teenage runaway's expulsion from school, history of drug and alcohol abuse, and statement that "something bad happened" were insufficient to justify the placement of the girl in a safe house under a parental "no contact order" and the subsequent removal for two months following her discharge. Likewise, in De La Font v. Beckelman, 264 F. Supp. 2d 650, 653-54, 658 (N.D. Ill. 2003), the court denied the caseworkers' motion to dismiss on qualified immunity grounds because the allegation that the father sexually abused one of his preschool students, by itself, was insufficient to justify initially restraining him from contact with his own children, and the subsequent investigation revealed no new evidence that might have justified continuing the restraints. See also Gomes v. Wood, 451 F.3d 1122, 1135 (10th Cir. 2006) (finding a constitutional violation because the doctor examining the child's skull fracture was comfortable letting the mother take the child home, because he was never highly suspicious of abuse when he called the child welfare agency, and because the mother's trips to the doctor on three successive days were "arguably inconsistent" with that of an abusive or neglectful

parent)[4]; Malik v. Arapahoe County Dep't of Soc. Servs., 191 F.3d 1306, 1315 (10th Cir.

1999) (finding no "extraordinary circumstance dangerous to the child" justifying removal

because the caseworkers only sought custody to interview a child in isolation and thereby

circumvent the protective interview conditions that the family attorney proposed);

Whisman v. Rinehart, 119 F.3d 1303, 1310 (8th Cir. 1997) (finding that third hand

hearsay as to the mother being intoxicated while the child was being cared for by a

babysitter, by itself, was insufficient to justify removal); Slough v. Telb, 644 F. Supp. 2d

978, 993 (N.D. Ohio 2009) (denying qualified immunity to defendants who initiated the

domestic violence investigation through a series of false accusations and used coercive

tactics to elicit false testimony from the abused mother); O'Donnell v. Brown, 335 F.

Supp. 2d 787, 797-822 (W.D. Mich. 2004) (finding no exigent circumstances because

removal was predicated solely on the fact that "three young children, one of whom was a

six month old baby, were left for the evening under the supervision of a twelve year old,"

and that "authorities were unable to contact the parents"); and Yuan v. Rivera, 48 F.

Supp. 2d 335, 345-48 (S.D.N.Y. 1999) (denying qualified immunity because defendants

knew, when they held the injured child at a hospital, that the mother could not have

inflicted the child's injuries because she was not even home when the father perpetrated

the abuse).

---

[4] Nevertheless, the court found that the defendants were entitled to qualified immunity because both the doctor and the caseworker inspecting the height of the bed from which the child allegedly fell found the mother's explanation suspicious, and because the mother only sought treatment for the skull fracture the next day. Gomes, 451 F.3d at 1137.

Unlike these cases (and assuming that it would even occur to a reasonable caseworker facing this particular factual situation to glean any sort of guidance from them), the appellants here possessed far more evidence such that they had "reasonable suspicion that [the] child . . . [wa]s in imminent danger of abuse." Croft, 103 F.3d at 1126. To begin, appellee was involved in a domestic violence dispute with her husband while she was caring for her child, which was severe enough to require her hospitalization and resulted in her husband being charged with second degree aggravated assault, second degree possession of a dangerous weapon for an unlawful purpose, and fourth degree possession of a dangerous weapon. When appellee returned home later that night, she smoked marijuana in an attempt to "self-medicate" the stress and anxiety caused by the dispute. During the ensuing investigation, a caseworker received reports from appellant's brother-in-law – the same person appellee trusted with the care of her child the evening that she returned from the hospital – that appellee used drugs, and learned that appellee had a prior disorderly person offense for marijuana possession. Unlike the caseworkers in several of the cases in which qualified immunity was denied, and despite appellee's attempts to attack the credibility of these reports, appellants were able to confirm this "hearsay" when appellant submitted two urine screens, both of which were positive for marijuana and consistent with her admitted recent use. As a result, DYFS filed an abuse and neglect complaint against appellee in family court, placed her on random drug screening, and enrolled her into a women's group for battered and drug abusing women. To ensure the child's continued safety, DYFS also required all of appellee's contact with

32

her child to take place in the presence of an approved in-home supervisor, which prompted appellee to enter a safe house facility. In the ensuing weeks, appellee became ineligible for public assistance and was no longer permitted to stay at the safe house, so on October 28, 2011, she unilaterally moved with her child into a home that DYFS had yet to approve. This series of events reveals that the appellants were justified in concluding that the child was at imminent risk of abuse or neglect in the current situation she faced and that the removal was not pretextual as in Malik, 191 F.3d at 1315.

Further, it is of no moment that the child was eventually returned after "several days" or that the family court later found no abuse or neglect, for this is the type of case that this Circuit foresaw when it acknowledged the possibility that "there may be cases in which a child services bureau may be justified in removing either a child or parent from the home, even where later investigation proves no abuse occurred." Croft, 103 F.3d at 1126; see also Van Emrik, 911 F.2d at 866 ("The issue is not whether it was absolutely essential to remove the child . . . [t]he issue is whether it was objectively reasonable for the defendants to make the decision they made.").[5]

---

[5] In fact, brief removals are not even actionable in the Second Circuit. Indeed, in Southerland v. City of New York, 680 F.3d 127, 152-54 (2d Cir. 2011), the court cited Kia P., 235 F.3d 749 to hold that under the Second Circuit's "brief-removal doctrine," a "four-day separation . . . was not so long as to constitute a denial of substantive due process." Given the allegation that appellee's child was only removed for "several days," that the Complaint does not allege that appellants violated appellee's right to procedural due process by not holding a post-removal hearing within two court days as required by N.J. Stat. Ann. § 9:6-8.29, that October 28, 2011 was a Friday, and that government offices are closed on weekends, it follows that the appellants should not be held accountable for this brief separation.

Appellants, like all child welfare caseworkers, walk a fine line when deciding whether to remove a child from a parent's custody on an emergent basis. If they remove the child, they risk infringing on the parent's constitutional right to family integrity, but if they fail to act, they risk exposing the child to injury and may be accused of infringing on the child's rights. Qualified immunity saves caseworkers from the agony of this predicament by shielding them from liability unless extant precedent "clearly established" the impropriety of their removal decision. Indeed, as one court noted, "[i]f [appellants are] not immune and [are] obliged to defend their actions in a civil trial . . . a most chilling effect would be visited upon them." Delbridge v. Schaeffer, 569 A.2d 872, 885 (N.J. Super. Ct. Law Div. 1989). "[I]t is precisely in [this] case[] . . . where the indications of abuse are subtle or sketchy – and, thus, most in need of investigation – that the chilling effect of [a denial of qualified immunity] will be most felt." Ibid.

Given the state of the law as of October 28, 2011, however, it cannot be said that appellants were "plainly incompetent" or "knowingly violated" the law. Rather, they operated in a murky area of the law where, as several courts have readily acknowledged, clear rules are inherently difficult to establish, and did not transgress the few extraneous ones that could be said to exist. Therefore, this Court should reverse the District Court, find that appellants are entitled to qualified immunity, and dismiss appellee's substantive due process claim.

## **Conclusion**

For these reasons, the Court should reverse the District Court's finding that appellants are not entitled to qualified immunity, and dismiss appellee's substantive due process claim against appellants.

Respectfully submitted,

JOHN J. HOFFMAN
ACTING ATTORNEY GENERAL OF NEW
JERSEY
R.J. Hughes Justice Complex
25 Market Street, P.O. Box. 112
Trenton, New Jersey 08625-0112
*Attorney for Defendants-Appellants*

By:    _/s/ Benjamin H. Zieman_____
        Benjamin H. Zieman (NJ ID # 082712013)
        Deputy Attorney General
        Benjamin.Zieman@dol.lps.state.nj.us

Dated: May 4, 2015

## Certification of Bar Membership

I certify that I am a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

/s/ Benjamin H. Zieman
Benjamin H. Zieman (NJ ID # 082712013)
Deputy Attorney General

Dated: May 4, 2015

## Certification of Compliance

Pursuant to Fed. R. App. P. 32(a)(7)(C)(i) and L.A.R. 31.1(c), I certify that:

1. This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7) because the brief contains 9,454 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), and thus does not exceed the 14,000-word limit.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because the brief has been prepared in a proportionally spaced typeface using the Microsoft Word word-processing system in Garamond that is at least 14 points.

3. The text of the brief filed with the Court by electronic filing is identical, except for signatures, to the text of the paper copies.

4. This brief complies with L.A.R. 31.1(c) in that prior to being electronically mailed to the Court today, it was scanned by the following virus detection software and found to be free from computer viruses:

    Company: McAfee, Inc.

Product: McAfee VirusScan Enterprise + AntiSpyware Enterprise, version
8.8.0 (8.8.0.1247).

/s/ Benjamin H. Zieman
Benjamin H. Zieman (NJ ID # 082712013)
Deputy Attorney General

Dated: May 4, 2015

## **Certification of Service**

I hereby certify that on May 4, 2015, I caused the Brief for Appellants and Joint
Appendix (Volumes I and II) to be filed with the Clerk of the United States Court of
Appeals for the Third Circuit via electronic filing and by causing an original and six paper
copies of the brief, along with four copies of the appendix, to be sent via UPS overnight
mail. Opposing counsel will receive service via the Court's electronic filing system.

/s/ Benjamin H. Zieman
Benjamin H. Zieman (NJ ID # 082712013)
Deputy Attorney General

Dated: May 4, 2015